104 So.2d 524 (1958)
H.P. GORDON, Harry E. King, James L. Busbee and Rollie Arnold, Appellants,
v.
STATE of Florida, Appellee.
Supreme Court of Florida.
July 25, 1958.
*527 Martin & Martin, Plant City, and Bentley, Shafer & Miller, Lakeland, for H.P. Gordon. James L. Busbee, Rollie Arnold and Sentell Monk; Chester Bedell, Jacksonville, and L. Grady Burton, Wauchula, for Harry E. King.
Richard W. Ervin, Atty. Gen., and Odis M. Henderson, Asst. Atty. Gen., for appellee.
THORNAL, Justice.
Appellants Gordon and King seek reversal of a judgment of conviction entered pursuant to a jury verdict finding them guilty of the crime of subornation of perjury. Appellants Busbee and Arnold seek reversal of a judgment of conviction entered pursuant to a jury verdict finding them guilty of the crime of perjury.
A total of seventy-nine alleged errors have been assigned by the four appellants. Those which require attention are discussed. The others are not such as to require detailed comment.
During the times herein mentioned appellant King was the State Senator from Polk County. He had been designated president of the Senate but had to stand for re-election in the primaries and general election of 1956. In the latter part of 1955 King suspected that opposition was brewing for the 1956 Spring Primary. One of the rumored opponents was State Representative Boone D. Tillett. In late October or early November, 1955, King approached Tillet in what appears to have been an effort to discourage the latter from entering the Senate race. This initial conference set in motion one of the most bizarre transactions that has come to light in the history of Florida politics.
After several conferences back and forth it was finally agreed between the two that *528 King would pay Tillett the sum of ten thousand dollars to keep the latter out of the Senate race. At the outset it appeared to be Tillett's notion that he would not reveal the scheme until after the 1956 Spring primaries. He apparently lost control of the situation when he reported the affair to the State Attorney in Tallahassee, as we shall see. The ultimate arrangement was that in exchange for the ten thousand dollars Tillett would deliver to King certain photographs and affidavits that King felt would have been damaging to him politically. In addition it was agreed that Tillett would sign a statement announcing that he would not enter the Senate race. They finally agreed to exchange documents for money in the vicinity of King's citrus grove, eight miles out of Babson Park in Polk County, on the night of February 4, 1956. They there burned the photographs and affidavits. A part of the plan was that Tillett would go to Tallahassee and advise a representative of the Associated Press that he was not entering the Senate race and that a letter would be forthcoming to that effect. Tillett did go to Tallahassee but merely advised Mr. Harold Parr of the Associated Press that he, Parr, would receive a certain letter. Tillett added the request that instead of opening the letter, the newspaperman should deliver it unopened to Honorable William D. Hopkins, State Attorney for the Second Judicial Circuit. Tillett also communicated with Mr. Hopkins and Honorable Reeves Bowen, who for many years has been the head of the Criminal Division of the Attorney General's office. Tillett apparently advised them of the whole plot.
According to the understanding, King mailed the Tillett withdrawal letter from Tampa. As we shall see, although King was ignorant of the fact, Tillett had arranged to have his name signed to this letter by one of his friends. When the letter was received by the Associated Press representative it was opened and the contents published. It was then turned over to State Attorney Hopkins by Mr. Parr. This exploded the whole scheme and produced public statements back and forth by King and Tillett. It also produced something else  a grand jury investigation of the whole affair. We glean from this record that the investigation was at least suggested in a request by Tillett to the State Attorney for the Tenth Judicial Circuit which includes Polk County.
Before the grand jury convened to consider the matter the Governor assigned Mr. Hopkins, as State Attorney, to go to the Tenth Circuit and investigate the affair. This Mr. Hopkins did. Called to testify before him were many witnesses including appellants Gordon, Busbee and Arnold. Gordon was sheriff of Polk County. Busbee and Arnold were two of his deputies.
The statements under oath before Mr. Hopkins, as State Attorney, revealed that Gordon had been involved in numerous conversations regarding the affair with both King and Tillett during the period of negotiations leading up to the alleged "pay-off" on February 4, 1956. He could hardly be classed as an "intermediary." However, he appeared to be a mutual political ally of both principals. He willingly exposed himself to conversations with both parties. Shortly prior to the fatal date, the sheriff had assigned Busbee and Arnold to "co-operate" or "work" with Senator King. Busbee told the State Attorney that he was secreted in the King grove at the time of the "pay-off" and saw some papers passed from Tillett to King while the two were seated in an automobile. He said he then saw the two men get out of the automobile and burn something in front of the car. Arnold stated that he was present in the grove with Busbee, that he saw "two men" in the car and also witnessed the burning of something. He did not identify the men or witness the passing of the papers.
After the matter was investigated by State Attorney Hopkins, he presented the whole thing to the grand jury which was empaneled on March 13, 1956. On March *529 14, 1956, Busbee and Arnold testified before the grand jury pursuant to summons. From the grand jury witness stand Busbee and Arnold reaffirmed under oath the truth of their prior statements to Hopkins regarding their presence at the scene of the "pay-off" on February 4, 1956, as well as the things which they then saw, all of which are summarized above. On March 16, 1956, the grand jury indicted Busbee and Arnold for the crime of perjury. On March 20, 1956, the grand jury indicted King for alleged violations of the State Election Code, F.S.A. § 97.011 et seq. It should be noted that six days elapsed between the time Busbee and Arnold testified and the subsequent indictment of King.
Honorable Clifton Kelly, County Solicitor of Polk County, with understandable propriety asked to be excused from prosecuting this matter because his brother was also a candidate for the State Senate in the approaching primary. The Governor appointed Honorable Paul B. Johnson, County Solicitor of neighboring Hillsborough County, to serve in the stead of Mr. Kelly. On April 13, 1956, the acting County Solicitor filed a six-count information against the four appellants and one Sentell Monk, a county jailor, who as it seems allegedly had altered certain jail records to make it appear that Busbee and Arnold could have been at the pay-off scene at the time they swore they were there. Allegedly the unaltered jail records would have shown that at the time of the alleged "pay-off" the deputies were apprehending prisoners and placing them in jail. Certain State witnesses testified that this was actually a fact. Others stated that in their opinions the jail records had been altered. For reasons hereafter mentioned, Monk is not a party to the appeal in this court.
The sum of the information on which the defendants were tried and convicted is as follows:
Count 1: Gordon, King, Busbee, Arnold and Monk were charged with conspiracy to have Busbee swear falsely before the grand jury.
Count 2: Gordon, King, Busbee, Arnold and Monk were charged with conspiracy to have Arnold swear falsely before the grand jury.
We here interpolate that at the time of the alleged offense conspiracy to commit any offense was a misdemeanor. Section 833.01, Florida Statutes 1955, F.S.A. Appeals from misdemeanor convictions are heard by the circuit courts. The convictions under the first two counts for conspiracy are therefore not before us. Hence, the defendant Monk is not a party to this appeal. Similarly, we do not here pass on the conspiracy convictions of the four appellants. We proceed to epitomize the other four counts of the information.
Count 3: Gordon and King were charged with subornation of the alleged perjury of Busbee.
Count 4: Gordon and King were charged with subornation of the alleged perjury of Arnold.
Count 5: Busbee was charged with perjury before the grand jury while that body was investigating alleged violations of the Election Code.
Count 6: Arnold was charged with perjury before the grand jury while that body was investigating alleged violations of the Election Code.
After a trial that lasted for three weeks Gordon and King were found guilty under Counts 3 and 4; Busbee and Arnold were found guilty under Counts 5 and 6, respectively. As mentioned above, they were also convicted under Counts 1 and 2 but these convictions are not before us. Motions for new trials were denied. Judgments of conviction and sentences to terms in the state prison were entered and prescribed. Reversal of these judgments is now sought.
It should be kept in mind that these appellants were being prosecuted on charges *530 of perjury and subornation thereof. We are not here dealing with violations of the election laws or breaches of rules of political morals. A studious examination of this record produces the inescapable conclusion that unfortunately throughout the trial resentment against alleged political misprisions and politically offensive conduct was permitted to permeate the proceeding. While this is quite understandable in the light of the political atmosphere that prevailed at the time, nevertheless, the rights of these appellants who were on trial for two of the noxious charges in the Criminal Code cannot be measured by our concept of political morality. Tindall v. State, 99 Fla. 1132, 128 So. 494. Whether the election laws were violated is an entirely separate matter. We here deal with perjury and subornation of perjury and nothing else.
The crime of perjury committed in a judicial proceeding is condemned by Section 837.02, Florida Statutes, F.S.A. The crime of subornation of perjury is condemned by Section 837.03, Florida Statutes, F.S.A. The crimes are not clearly defined by the statutes. We, therefore, look to cases and the common law for definitions. In Wharton's Criminal Law and Procedure, Vol. 3, Sec. 1290, we find the following:
"At common law perjury was (1) the wilful (2) giving of false testimony (3) on a material point (4) in a judicial proceeding, (5) by a person to whom a lawful oath had been administered."
See also Clark and Marshall, Crimes (5th ed.), p. 641, Sec. 446(a). The foregoing are the basic essentials in Florida. Miller v. State, 15 Fla. 577. The cited statute (Section 837.03, Florida Statutes, F.S.A.) suggests and the authorities agree that subornation of perjury consists of procuring or inducing another person to commit the crime. See Wharton's Criminal Law and Procedure, Vol. 3, Sec. 1321; Clark and Marshall, Crimes, (5th ed.) p. 652, Sec. 446(h). Also see Milligan v. State, 103 Fla. 295, 137 So. 388. An essential element of subornation of perjury is the actual commission of the crime of perjury. The authorities are not entirely in accord as to whether conviction of the perjurer is a condition precedent to conviction of one who suborns the perjurer. There is complete accord, however, on the proposition that in order to establish subornation of perjury it is essential that the commission of the crime of perjury by the person suborned must be proved as an element of the substantive crime of subornation. Drawdy v. State, 98 Fla. 473, 123 So. 913; Milligan v. State, supra.
It is clear that in the case before us proof of the alleged perjury by Busbee and Arnold were conditions necessary to establish the charge of subornation of perjury leveled against Gordon and King. It will be noted from the definition of the crime of perjury that the essential elements are the wilful giving of false testimony under lawful oath on a material matter in a judicial proceeding. The cases are in accord that a grand jury investigation is a judicial proceeding which will support a charge of perjury if the other elements are present. Craft v. State, 42 Fla. 567, 29 So. 418; Rivers v. State, 121 Fla. 887, 164 So. 544; Tindall v. State, supra.
One of the principal points assigned by the appellants for reversal of the judgment under attack is that the alleged false testimony given under oath by Arnold and Busbee before the grand jury was not material to the matter then under investigation by the grand jury. The information alleged in substance that while the grand jury was investigating, among other things, violations of the election laws, Busbee falsely testified that he witnessed and observed a meeting between Tillett and King and that he witnessed and observed the burning of certain materials and objects by the two men. The information alleges that Arnold falsely testified that he and Busbee together witnessed the meeting and the burning of the materials.
*531 It appears to be the position of the appellants that whether Busbee and Arnold actually witnessed the occurrences to which they testified was completely immaterial to the subject of the grand jury investigation, to-wit, the alleged violations of the election laws. The rule is clear that in order for the false testimony to constitute perjury it must be material to the subject under consideration in the judicial proceeding. Miller v. State, supra; Robinson v. State, 18 Fla. 898; Smith v. State, Fla. 1957, 92 So.2d 411. The cases hold that in order for testimony to be material it must have some weight and reference to the determination of an issue which is before the court for judicial determination. It is not essential that the false testimony bear directly on the main issue. It is sufficient if the false testimony is collaterally or corroboratively material to the ultimate material fact to be established. The degree of materiality is not of any important consequence. Robinson v. State, supra; Herndon v. State, 72 Fla. 108, 72 So. 833; Fields v. State, 94 Fla. 490, 114 So. 317; D'Alessandro v. State, 116 Fla. 749, 156 So. 702; Tindall v. State, supra; Doan v. United States, 9 Cir., 202 F.2d 674.
The State contends and we agree that the testimony of Busbee and Arnold before the grand jury was of sufficient materiality to the subject of the investigation to support the charge of perjury if the other elements of the crime were present. The point apparently under investigation by the grand jury was the transaction between Tillett and King with reference to the exchange of money in consideration of certain matters relating to the forthcoming primary election. Without corroboration the State would have been compelled to rely almost entirely on a narrative of events as related by Mr. Tillett. The testimony of Busbee and Arnold, if true, tended to support various material aspects of the testimony given by Tillett in regard to the time, place and secretive nature of the exchange, the manner in which the parties went about accomplishing the transaction, the burning of the documents, as well as venue. Although the appellants ask us to decide that this testimony was immaterial and that their complete exoneration should be ordered, we cannot agree with their position. The trial judge ruled correctly in holding that the alleged false testimony was material to the matters under consideration by the grand jury.
It is further contended that the testimony given by Busbee and Arnold before the grand jury was lacking in the essential of having been given pursuant to a lawful oath. Markey v. State, 47 Fla. 38, 37 So. 53. On this point it appears to be appellants' position that in actuality the grand jury was not investigating violations of election laws when Busbee and Arnold testified on March 14, 1956. They suggest as a matter of fact that the grand jury was investigating Busbee and Arnold on suspicion of falsely swearing before State Attorney Hopkins. Section 837.01, Florida Statutes, F.S.A. They then reason that Busbee and Arnold should have been warned that they were under investigation and should have been advised of their constitutional privilege against self-incrimination. This leads appellants to the ultimate contention that absent such warning and advice Busbee and Arnold were led to testify in a self-incriminating manner and that this in turn destroyed the binding effect of the oath which they took before the grand jury, and immunized them against subsequent prosecution.
This encourages the appellants to claim that the convictions should be reversed with directions for their discharge. Again, however, we are compelled to disagree with the appellants and agree with the position of the trial judge. The record clearly sustains a conclusion that when Busbee and Arnold were subpoenaed to testify before the grand jury, that body was investigating alleged violations of the election laws. We find nothing to compel us to conclude that at that point Busbee and *532 Arnold themselves were under investigation. We note in passing that perjury is not one of the crimes mentioned in our immunity statutes. Sections 932.29 and 104.39, Florida Statutes, F.S.A. The oath which a witness takes is sufficient to put him on notice that he is expected to tell the truth and we are not aware of any authorities which require that a witness be warned that if he fails to tell the truth he will likely suffer the pains of a prosecution for perjury. People v. Miller, 264 Ill. 148, 106 N.E. 191; Hardin v. State, 85 Tex. Cr.R. 220, 211 S.W. 233, 4 A.L.R. 1308.
Another aspect of the matter is that these two men apparently testified without reservation. Had they so desired they could have claimed their privilege against self-incrimination if they were faced with the alternatives of either committing perjury before the grand jury or admitting that they swore falsely before the State Attorney. The statutory immunity granted to a witness who is required to testify with reference to certain specified crimes will not immunize him against a subsequent prosecution for perjury in the event that he testifies falsely. 41 Am.Jur. "Perjury" Sec. 52, p. 29; State v. Faulkner, 175 Mo. 546, 75 S.W. 116; Gendron v. Burnham, 146 Me. 387, 82 A.2d 773, 38 A.L.R.2d 210, annotation at page 314. Having failed to assert their privilege and having proceeded to testify, they are subject to the consequences if they testified falsely. Gendron v. Burnham, supra; also see State v. Byington, 1945, 114 Utah 388, 200 P.2d 723, 5 A.L.R.2d 1393, annotation at page 1436.
In outlining the State's case in his opening statement to the jury, the county solicitor undertook to summarize what he expected to prove with regard to the negotiations between Mr. Tillett and Senator King. In the course of his remarks, in each instance over the objection of the appellants, the county solicitor was permitted to advise the jury that he intended to prove occasions from time to time during the period of negotiations between the men when Mr. Tillett, after conferences with Senator King, would meet with groups of friends "all respectable businessmen of this area" and that Tillett "conferred with his advisors and upon their advice he decided to expose this attempted pay-off and turn the evidence over to the proper authorities" and numerous other statements of similar nature. At one point when objections were offered the trial judge observed "the complications of this case are such that the court is not able to determine whether or not that is material or not. I can see where it might be material." (Emphasis added.) We realize that these comments by the prosecutor did not constitute evidence and the jury was so advised. We mention them merely as a part of the background against which the evidence itself was subsequently allowed to go to the jury. In the presentation of the State's case Mr. Tillett was permitted to testify that after his first conversation with Senator King he sought the advice of a group of friends, naming them and the place of their meeting, that they advised him what to do and that he was going through with the deal "on advice of friends" all highly respectable businessmen.
On another occasion Mr. Tillett was permitted to testify to the effect that he talked to a particular friend on the telephone, that pursuant to this conversation he arranged a meeting at that friend's house from which they moved on to the home of a circuit judge and discussed generally what was going on, that at that time they devised a plan for a friend of Mr. Tillett to sign Tillett's name to the withdrawal letter as evidence of the fact that Tillett's motives were pure and that he was not particeps crimini.
On another occasion Tillett was permitted to testify that after the February 4 meeting with King he immediately went to the home of one of his friends, told him that he had the ten thousand dollars and that they went to Lake Hamilton and put the money in a safe. Tillett was further permitted to testify that while in Tallahassee he had a conversation with an Assistant *533 Attorney General and that he had another conversation with Honorable William D. Hopkins, the State Attorney, and that he had a further conversation with a representative of the Associated Press and "told him to turn it (the letter) over to the State's Attorney, Mr. Hopkins."
All of these alleged conferences were had privately by Mr. Tillett and out of the presence of all the defendants. When objections were made, the trial judge was of the view that it was permissible to show these various conferences and to explain Mr. Tillett's actions pursuant to the conferences in order to establish Tillett's "motive." We are here compelled to disagree with the ruling of the trial judge. As pointed out in the forepart of this opinion no one is here being tried for violations of the election laws. If Mr. Tillett were, then whether he was acting in good faith and from laudable motives could be substantially material. However, Mr. Tillett is not on trial for anything and his motives are totally immaterial. We are here dealing with the particular charge that Busbee and Arnold committed perjury and that Gordon and King suborned the perjury. Whatever Mr. Tillett's motives were throughout the transaction could have no possible bearing at all on the truth or falsity of the testimony given before the grand jury or the charge that the witnesses were procured to do so. The only purpose that could be served by the testimony improperly admitted would be to portray Mr. Tillett as having proceeded from laudable motives as contrasted to the appellants who were naturally portrayed as wilful violators of the criminal law who were engaged in a plot to violate the election laws. The improper and unfair impact of such testimony upon the jury sitting to determine guilt or innocence of the appellants with reference to the perjury and subornation charges certainly becomes obvious and cannot be disregarded as trivial. Whatever Mr. Tillett's objectives or ideas were in conducting the negotiations with Senator King could have no possible bearing on whether or not Busbee and Arnold were at the scene of the pay-off and saw what they said they saw or whether Gordon and King induced them to testify accordingly. We think this line of testimony has no place whatever in this record and that it produced substantial injury to these appellants in the trial and ultimate outcome of the case. It illustrates the point which we made at the outset to the effect that the suspected breach of political morals and suspicions of election law violations were permitted to saturate this record in order to convict appellants of perjury and subornation. The result was that a mass of irrelevant although harmful testimony was presented to the trial jury. Capps v. State, 1940, 29 Ala.App. 192, 194 So. 689; Saucier v. State, 95 Miss. 226, 48 So. 840.
Appellant King further contends that the trial judge committed error when he allowed into evidence the copy of the indictment filed by the grand jury indicting King for violations of the election law. It so happens that Busbee and Arnold were indicted for perjury on March 16, 1956. It was not until four days later that King was indicted for violations of the election laws. A copy of this indictment was allowed into evidence for the ostensible purpose of showing that the grand jury was investigating violations of the election laws when Busbee and Arnold allegedly testified falsely on March 14, 1956. In the first place this and all other courts so far as we know have consistently adhered to the general rule that when a defendant is on trial for a particular crime it is not proper to admit evidence of commission of unrelated collateral crimes. There are exceptions to this rule whereby it is permissible to allow evidence of collateral crimes in order to establish intent, motive of a pattern of criminality. The allowance of the indictment into evidence in this instance does not fall within any of the exceptions. It could serve no genuine purpose other than to convey to the trial jury the fact that the grand jury had deliberated and had concluded that Senator King was guilty of the offense of violating various sections of the election law. It *534 could do no more than substantially prejudice the appellant King in the minds of the trial jury and place him at a tremendous disadvantage in defending himself against the charge of subornation of perjury.
It appears to us that the fact that the grand jury indicted King for violation of the election laws six days after Busbee and Arnold testified before that body is certainly not conclusive on the point as to what the grand jury was investigating when the two men did testify. Matters under investigation by the grand jury were easily provable by the testimony of the court reporter who transcribed the grand jury proceeding or for that matter by any member of the grand jury or by the transcript of the initial recorded proceedings of the grand jury. State ex rel. Brown v. Dewell, 123 Fla. 785, 167 So. 687; Tindall v. State, 99 Fla. 1132, 128 So. 494; Settles v. State, 75 Fla. 296, 78 So. 287. Actually the court reporter who testified for the State certified in his certificate to the transcript of the grand jury testimony the subject of the grand jury investigation. Suffice it to say that permitting the State to offer in evidence a collateral indictment for an entirely separate offense was substantial error that inescapably produced harmful results. The State incidentally has produced no authority whatever that would allow the placing of this indictment into evidence.
On the contrary a strongly analogous rule, well supported by both reason and the authorities, militates almost conclusively against the admissibility of the indictment. The rule is well established that while such portion of the record in the inquiry or judicial proceeding in which the perjury allegedly occurred is admissible at the perjury trial to the extent necessary to show that it was a judicial proceeding and that the allegedly false testimony was material thereto, nevertheless, the result or culmination of such inquiry or proceeding is immaterial and its allowance into evidence in the perjury trial is erroneous. Thus if perjury occurs in a criminal trial, the judgment of conviction or acquittal in that trial is not admissible in a subsequent perjury trial. This is so because it obviously introduces to the jury hearing the perjury case the plainly collateral issue as to whether the jury in the prior criminal trial believed or disbelieved the allegedly perjured testimony. State v. Armstrong, 1935, 337 Mo. 967, 87 S.W.2d 164; Starnes v. State, 1933, 125 Tex.Cr.R. 21, 66 S.W.2d 335; Warren v. State, 1909, 57 Tex.Cr.R. 518, 123 S.W. 1115; State v. Olson, 1932, 186 Minn. 45, 242 N.W. 348; State v. King, 1940, 165 Or. 26, 103 P.2d 751; Saucier v. State, 95 Miss. 226, 48 So. 840.
The analogy of the last stated rule to the case before us we think is clear. While it was of course proper for the State to establish that the grand jury was investigating alleged violations of the election laws we do not think it was proper to advise the trial jury of the ultimate action of the grand jury. If the testimony of Busbee and Arnold was false it would have constituted perjury regardless of whether the grand jury indicted King or anyone else for election law violations. In other words the finding of the indictment against King had no bearing whatever on whether or not perjury was committed by Busbee and Arnold. It appears to us that it was clearly prejudicial error to inform the jury trying King for subornation of perjury that the grand jury had already indicted him for election law violations, even though the trial judge endeavored to limit the jury's consideration of the indictment as mere evidence of the subject matter of the grand jury inquiry. Here again the perjury trial became entangled with aspects of alleged election law violations that had no material bearing whatever on the immediate charges against these appellants.
The State was permitted to place in evidence the testimony of one C.A. Smith to the effect that, at the request of appellant King, Smith had cashed a check in the amount of one thousand two hundred dollars at a Winter Haven bank. He testified that the check was payable to cash and was signed by one Al Lane, deceased, who had *535 operated a "package and bar up in Orlando." Similarly the State was also permitted to place in evidence the testimony of one A.D. Tomasello to the effect that he had made two cash loans to King in the amount of two thousand five hundred and five thousand dollars, respectively. Mr. Tomasello was identified as a public relations representative of a Florida trucking company and a Washington chain store organization. The money obtained from these loans was, of course, not traced into the ten thousand dollars payment by King to Tillett. Even if it had been, however, we can see no materiality whatsoever between the testimony of these two witnesses and the issues involved in the trial of the appellants for perjury and subornation of perjury. Here again is an instance where the aspect of alleged violations of the Election Code were allowed to enter into the trial of these appellants on the perjury matters. Once again it is important that we emphasize that the instant appeal and the instant case involved simply whether Busbee and Arnold swore falsely before the grand jury and whether Gordon and King procured them to do so. Insofar as the instant case is concerned the source of the money which King paid over to Tillett was totally irrelevant and immaterial. If King were being tried for violations of the Election Code involving illegal contributions or payments, an entirely different proposition might be involved. However, the alleged perjury simply had to do with whether Busbee and Arnold witnessed the two men at the pay-off scene and witnessed certain occurrences at the time. Whether King obtained the money from his own bank account or from some other source was totally useless and immaterial as a means of establishing any fact related to the crimes alleged in the information. The only purpose that this testimony could have served was to create a prejudice in the minds of the trial jury, based on the suggestion that King may have violated the Election Code and that, therefore, Busbee and Arnold were guilty of perjury and Gordon and King were guilty of subornation.
In defense of the testimony the State, by its brief, offers a rather meager explanation to the effect that Tillett had testified that he received the money in certain denominations and that these two witnesses were offered to corroborate Tillett's testimony (which in itself was totally immaterial) although the sum of the testimony of these witnesses was merely that they had delivered the money to King in cash. The State brushes off the contention that the testimony was immaterial and prejudicial with the mere observation that it was not. Adding immaterial testimony to corroborate immaterial testimony does nothing more than compound the prejudicial effect of the error. This is obviously so because the corroboration adds greater weight to the testimony which it supports. If the testimony which is corroborated was in itself prejudicially immaterial, certainly the error is emphasized by the addition of support or corroboration of the original error. 20 Am.Jur. "Evidence" p. 242, Sec. 248; 13 Fla.Jur. "Evidence", p. 117, Sec. 112. In the first place there was no dispute over the fact that the ten thousand dollars were paid to Tillett by King and whether they were paid in one-hundred-dollar bills or one-thousand-dollar bills has no bearing whatever on whether Busbee and Arnold saw certain papers passed between Tillett and King and whether they saw the two men burning certain materials. This was the crux of the controversy and the source of the money paid by King to Tillett was of no materiality at all when related to the issues before the trial court. We think that this testimony was obviously harmful and prejudicial and constitutes another reversible error.
Prior to the trial the appellants filed a formal written motion setting out that the complete transcript of the testimony of all witnesses who appeared before the grand jury had been released to the prosecuting officers for their use in the prosecution of the instant case. The motion pointed out the voluminous nature of the grand jury proceeding and requesting the trial judge to permit the appellants to examine the transcript of the testimony which had been released *536 to the prosecuting officials and to make copies of the testimony of all of the various witnesses who testified before the grand jury in order to enable the appellants to prepare their defense. The trial judge denied the motion except insofar as it related to the testimony of any witnesses who testified before the grand jury and who would be called to testify personally in behalf of the State from the witness stand in the instant trial. State ex rel. Brown v. Dewell, 123 Fla. 785, 167 So. 687. We should here point out that the critical evidence used by the State to convict the appellants was a transcript of the testimony of the appellants Gordon, Busbee and Arnold given before the grand jury. In other words, while these three appellants were not called as witnesses in the trial of the instant case, their ex parte testimony before the grand jury was placed in evidence to enable the State to convict Busbee and Arnold of perjury and Gordon and King of subornation of perjury. The transcript was also used against all of the alleged conspirators named in Counts 1 and 2 of the indictment, including King and Monk.
In ruling on this motion to inspect the transcript of testimony of the grand jury we think perhaps the court may have overlooked the full effect of Section 905.27, Florida Statutes, as amended in 1951, F.S.A. This statute reads as follows:
"Testimony not to be disclosed; exceptions
"No grand juror, prosecuting attorney, or special legal counsel, court reporter, interpreter, or any other person appearing before the grand jury, shall disclose the testimony of a witness examined before the grand jury or other evidence received by it except when required by a court to disclose the testimony of a witness examined before the grand jury for the purpose of ascertaining whether it is consistent with that of the witness given before the court, or to disclose the testimony given before the grand jury by any person upon a charge against such person for perjury in giving his testimony or upon trial therefor, or when permitted by the court in the furtherance of justice. Any person violating the provisions of this act shall be guilty of a criminal contempt of court, and punished accordingly." (Emphasis added.)
It will be noted from examination of the quoted statute that the crime of perjury is given special treatment when the question of raising the traditional secrecy of grand jury proceedings is involved. By the statute a court may require the disclosure of the testimony of a witness before a grand jury upon a charge against such person for perjury in giving his testimony or upon a trial therefor. In other words, inasmuch as a grand jury investigation is a judicial proceeding out of which the crime of perjury may arise, the Legislature has prescribed in effect that when a person is charged with having committed perjury before a grand jury a court may properly remove the cloak of secrecy with reference to that particular testimony. With regard to the appellants Arnold and Busbee it appears to us that inasmuch as the cloak of secrecy had already been raised by the delivery of a complete transcript of the grand jury proceeding to the State, there can be little doubt but that these appellants were granted the right by the quoted statute to have a copy of the testimony given by them before the grand jury upon which the perjury charge was based. This would appear to be of special significance in a case such as this where the testimony was voluminous and involved much background data as well as the particular answers which were allegedly perjurious. The grand jury testimony of Gordon, Busbee and Arnold, read into this record by the Court Reporter, filled two hundred pages of legal cap.
The effect of the ruling of the trial judge insofar as Arnold and Busbee were concerned was to hold that the State could use a copy of their testimony to charge them *537 with perjury, try them on the charge and send them to jail but in the same voice they were denied access to a copy of their testimony in order to equip themselves to defend against the charges. Under these circumstances it appears to us that common justice, much less the specific language of the statute, would have entitled Busbee and Arnold to have a copy of the testimony which they gave before the grand jury in order to prepare their defense.
By the same process of reasoning it appears to us that appellants Gordon and King were entitled to have a copy of the grand jury testimony given by Gordon, Busbee and Arnold which was placed in evidence against them by the State through the voice of the Court Reporter who transcribed the grand jury proceedings. Here again it should be observed that Section 905.27, Florida Statutes, F.S.A., gives special treatment to the crime of perjury in regard to the matter of raising the veil of secrecy that protects grand jury proceedings. We think by necessary inference and certainly by pointed analogy the privilege of examining a transcript of the testimony of the witnesses alleged to have perjured themselves should be made available to those accused of the crime of suborning that particular perjury.
The trial judge appears to have the view that with reference to the three appellants who had testified before the grand jury there was no justification for permitting an examination of the transcript of their testimony because of the fact that they were being tried for a crime arising out of their testimony and that they would be familiar with the testimony that they had given before the grand jury. While there is a measure of reason to this view, nevertheless, from a practical aspect in a case such as this the injustice of the rule becomes apparent. For a helpful discussion of the importance of making a transcript of such testimony available to a defendant in a perjury case, see United States v. Rose, 3 Cir., 215 F.2d 617. This is so because of the voluminous nature of the grand jury testimony as a result of which it could hardly be expected that an individual witness would recall every question and answer. Another factor is that the statute cited, in the absence of authorization by the court, would preclude each of the appellants who testified before the grand jury from revealing his testimony to anyone else. Furthermore, it should be remembered that a grand jury proceeding is in its nature ex parte in that the only ones present in addition to the witness are the grand jurors and the court officials. It would be impossible for the individual appellants to know what the others testified without an approving order of the trial judge.
What we have here written applies only to the crime of perjury and the related offense of subornation of perjury. We base our position primarily on the fact that the statute treats perjury as a peculiar exception to the secrecy rule that protects grand jury proceedings. We think also that subornation of the particular perjury is within the spirit, if not the letter, of the controlling statute. In denying access to the transcript of testimony given by witnesses who were not to be called to testify at the trial and who were not defendants we think the judge ruled correctly. However, in denying access to a transcript of the grand jury testimony of the appellants Gordon, Busbee and Arnold, error was committed for the reasons stated.
The appellants Gordon and Arnold further contend that the trial judge committed error when he denied their motion to allow their attorney to make the opening and closing argument to the jury. The record reveals that the appellant Busbee, who along with appellant Arnold was charged with perjury and together with appellants King, Gordon and Arnold was charged with conspiracy to commit perjury, offered the testimony of some thirteen witnesses. Appellants Gordon, Busbee and Arnold were represented by the same counsel.
*538 Each time a witness was called by Busbee the record affirmatively shows that he was called by this particular appellant and was not called in behalf of any of the other appellants. Numerous exhibits were introduced by Busbee. In each instance they were marked as exhibits for the "defendant Busbee." None of the defendants testified in his own behalf. At the close of all of the evidence, the attorney for Gordon and Arnold moved the court to allow him to make the opening and closing argument to the jury in behalf of those two defendants on the theory that they had not taken the witness stand nor had they offered any other testimony.
The trial judge was of the view that the witnesses who had testified on behalf of Busbee had given testimony which was of benefit to the defendants Gordon and Arnold and that this fact, coupled with the fact that all of these defendants were represented by the same lawyer, justified the denial of the right to open and close claimed by Gordon and Arnold. The witnesses called by Busbee had testified as to various matters relating to jail records and also in support of his contention that the records were kept in a slipshod manner and could not be relied upon for accuracy. The obvious purpose of the testimony of these witnesses was to show that Busbee could have been on the scene in the King Grove on the night of February 4, 1956, even though the jail records, which allegedly had been altered, would have indicated that at the particular time he was actually delivering a prisoner to the jail. One of his witnesses also testified on the subject of the alleged alteration of the records. This led the trial judge to his conclusion that the defendants Gordon and Arnold benefited by the testimony of the witnesses for Busbee and that, therefore, they could not claim the right to open and close.
Interestingly enough, however, the trial judge permitted the appellant King, through his attorneys, to make the opening and closing argument to the jury. If the theory of the trial judge was correct in denying to Gordon and Arnold the right to open and close merely because they received benefit from the testimony of the witnesses offered by Busbee, the same theory would have applied to the appellant King. This is so for the reason that by the 4th count of the indictment appellant King together with Gordon was charged with the crime of subornation of the alleged perjury of appellant Arnold. By the 3rd count King and Gordon were charged with suborning the alleged perjury of Busbee. Obviously, if Arnold and Busbee had been acquitted of perjury, King could not have been convicted of suborning the perjury. Consequently, any testimony that would benefit Arnold or Busbee on the perjury counts would likewise have benefited appellant King.
Gordon and King were in identical positions except that they had separate counsel. Nevertheless, King was permitted the opening and closing argument but the same privilege was denied to Gordon and Arnold. We think the trial judge ruled correctly with reference to King and committed error when he denied to appellants Gordon and Arnold the privilege of the opening and closing argument as against the State.
Gordon and Arnold base their position on the statutory privilege granted to them by Section 918.09, Florida Statutes, F.S.A., which reads as follows:
"In all criminal prosecutions the accused may at his option be sworn as a witness in his own behalf, and shall in such case be subject to examination as other witnesses, but no accused person shall be compelled to give testimony against himself, nor shall any prosecuting attorney be permitted before the jury or court to comment on the failure of the accused to testify in his own behalf, and a defendant offering no testimony in his own behalf, except his own, shall be entitled to the concluding argument before the jury." (Emphasis added.)
The identical question has recently been presented to this court by petition for certiorari *539 seeking review of the decision of the District Court of Appeal of Florida, First District, in Carter and Faulk v. State, 101 So.2d 911. By our opinion in Faulk v. State, Fla., 104 So.2d 519, we have disposed of the immediate question favorably to the contention of the appellants Gordon and Arnold. In the opinion last cited we traced in detail the statutory development of the rule and discussed in equally elaborate detail the development of the rule through our own opinions. We think it unnecessary to duplicate the discussion in the instant opinion. We here merely hold that on the authority of Faulk v. State, and the prior decisions of this court therein discussed, the trial judge committed error when under the circumstances here presented he denied to the appellants Gordon and Arnold the privilege of making the opening and closing arguments to the jury as against the State.
In Faulk v. State, we undertook to delineate the historical development of the rule in question primarily to demonstrate that there is nothing new or novel about it. It is thoroughly grounded in the criminal jurisprudence of this state and we sometimes find it difficult to understand why defendants on appeal have so often demonstrated that they have been denied the privilege. As previously pointed out this court did not make the rule. The Legislature made it and therefore we must follow it. Similarly, it is binding on the trial courts. When the privilege given by the statute is denied we have no choice but to point up the error and reverse a conviction even though it may mean an expensive re-trial, as will doubtless follow in the instant case. We have no alternative but to hold that as to the appellants Gordon and Arnold it was error under the circumstances to deny to them their vested privilege of having their attorney deliver the opening and closing arguments to the jury in their behalf.
When the State elected to place all of the appellants on trial collectively it could not thereby deprive a particular defendant of the privilege given by the subject statute even though a co-defendant elected to waive the privilege by offering testimony other than his own. The fact that one defendant might offer testimony that could benefit other defendants was the risk that the State assumed when it elected to charge and try the defendants collectively.
Appellants Busbee and Arnold contend that their trial and subsequent conviction became infected with incurable error when the acting county solicitor in his closing argument to the jury made the following comment:
"Now, we submit the truth of the matter is that Busbee and Arnold were not at the scene, because they couldn't have been. They didn't testify to what happened out there. Because all the other troopers and all the other testimony shows that they were not there. That's our contention. And we think we have shown that.
"But they say, they say they were there. So let's see how the log was changed to support their theory." (Emphasis added.)
When the quoted statement was made by the prosecuting officer no objection was tendered. When the trial judge ultimately charged the jury, he gave an instruction to the effect that a defendant on trial in a criminal case has the right to refrain from testifying and that no adverse inference should be drawn if he elects not to take the witness stand. The judge made no specific reference to the remark of the prosecutor. Nonetheless, appellants Busbee and Arnold assert that the observation of the county solicitor directly commenting on their failure to testify was a violation of their constitutional rights against self-incrimination guaranteed to them by Section 12 of the Declaration of Rights of the Florida Constitution, F.S.A., as well as a direct violation of the provisions of Section 918.09, Florida Statutes, F.S.A., to which we have made reference in discussing another aspect *540 of this appeal. The portion of Section 918.09, Florida Statutes, F.S.A., pertinent to the immediate point, reads as follows:
"* * * but no accused person shall be compelled to give testimony against himself, nor shall any prosecuting attorney be permitted before the jury or court to comment on the failure of the accused to testify in his own behalf, * * *." (Emphasis added.)
Here again we have a specific legislative prescription of a right to be accorded to those under prosecution for crime. Whether we as judges deem the rule to be wise and salutary is of no consequence at all and we assume no responsibility for it. The Legislature made the rule and we must follow it, at least until the Legislature changes it.
As early as Jackson v. State, 45 Fla. 38, 34 So. 243, this court recognized that the prosecuting officer would not be permitted comment on the failure of an accused to take the witness stand even though he does so by innuendo under the guise of disclaiming any intention of doing so. This was in 1903. We have throughout the years consistently adhered to the proposition that this is a binding and obligatory restriction placed on prosecuting officers as an aspect of due process in order to preserve to defendants the full measure of their constitutional privilege against self-incrimination.
Since Rowe v. State, 87 Fla. 17, 98 So. 613, this court has been aligned with the courts of other states which hold that when the prosecuting officer violates this rule, the trial becomes infected with error even though no exception is taken at the time and despite the fact that the trial judge might immediately rebuke the prosecutor for the violation. For the alignment of courts on this proposition see Pollard v. State, 201 Ind. 180, 166 N.E. 654, 84 A.L.R. 779. The courts which apply the rule in this fashion do so for the reason that when the prosecutor brings to the attention of the jury the failure of a defendant to testify, he naturally gives emphasis to the fact that the defendant could have testified if he had so desired and that by failing to do so he has something to hide. Immediately there is created in the mind of the average juror an ill-founded and prohibited prejudice which cannot be erased or eradicated either by apology or by judicial admonition. Barnes v. State, Fla. 1951, 58 So.2d 157. As so aptly described by Mr. Chief Justice Terrell in Carlile v. State, 129 Fla. 860, 176 So. 862, 864, such a prejudice "clings to the mind like a tattoo on the epidermis". Ordinarily improper remarks of counsel to the jury can be remedied by appropriate instructions by the trial judge. Consequently under ordinary circumstances such inappropriate remarks will not be reviewed by an appellate court unless timely objection is made in the lower court. This rule, however, is subject to the exception that if the improper remarks are of such character that neither rebuke nor retraction may entirely destroy their sinister influence then on appeal they may be considered as error even in the absence of an objection in the trial court. Carlile v. State, supra.
We have repeatedly held that comments by the prosecuting officer on the failure of defendants to testify come within this exception to the general rule. This is so for the reason that when the comment is made the seed of the evil result is sowed and no manner of correction will prevent its fruition into a fixed prejudice against the defendant. In Simmons v. State, 139 Fla. 645, 190 So. 756, this court reaffirmed its traditional position on this subject. Perhaps it is understandable that under the tension of a heatedly contested trial the prosecuting officer will momentarily and even in good faith violate the prescriptions of the statute. We feel certain that this was the situation in the matter before us. Likewise also it is understandable that the prosecutors as well as many others might deem the rule to be unwise and too much for the benefit of the defendant. We are not in a position to *541 elaborate upon the merits of such a viewpoint. Our responsibility as an appellate court is to apply the law as the Legislature has so clearly announced it. We are not endowed with the privilege of doing otherwise regardless of the view which we might have as individuals. Way v. State, Fla. 1953, 67 So.2d 321. Also see Trafficante v. State, Fla. 1957, 92 So.2d 811. The harmless error statute, Section 54.23, Florida Statutes, F.S.A., does not apply to this type of error.
By its brief the State makes no effort to distinguish the prior decisions of this court which we have hereinabove cited. On the contrary the State relies entirely on the rule of Gray v. State, 42 Fla. 174, 28 So. 53, and Clinton v. State, 56 Fla. 57, 47 So. 389, 390. In those cases we merely held that the statute does not prohibit legitimate comment on testimony properly before the jury. We held that the prosecutor could comment on conflicts and absence of conflicts. In both of the cases, however, this privilege was specifically circumscribed by the further statement that when the prosecuting officer engages in such discussions before the jury he cannot exercise the right in such fashion "as to make it directly or covertly a comment upon the failure of the accused to voluntarily become a witness." Clinton v. State, supra.
By its brief also the State attempts to defend the remark with the supposition that the prosecuting officer was not referring to the failure of the two defendants to take the witness stand but on the contrary was referring to the proposition that some other witnesses did not testify to what happened. We think that it is perfectly obvious from a casual examination of the quoted statement that the prosecutor could have been referring to no one other than the appellants Busbee and Arnold. Referring back to the statement it will be noted that he mentioned that "Busbee and Arnold were not at the scene because they couldn't have been." In the very next sentence he observed, "They didn't testify to what happened out there." The grammatical proximity of the two sentences and the interchange between the names of "Busbee and Arnold" and the pronoun "they" appear to us to point to the inescapable conclusion that reference was being made to the fact that these two defendants had failed to take the witness stand and testify as to actually what happened.
Again, because of this obvious error, we are compelled to hold that the rights granted to appellants Busbee and Arnold by the subject statute were violated and for the violation their subsequent conviction will have to be reversed.
We comment in passing on the contention of the appellant King that the trial judge committed error in advising the jury that he had requested State Attorney William D. Hopkins of the Second Judicial Circuit to participate in the prosecution of the instant case. The appellants appeared to spend a useless amount of time challenging and questioning the motives as well as the right of Mr. Hopkins to serve as a member of the prosecution's staff.
There is no suggestion in the record that he was doing other than fulfilling a sense of obligation when he complied with the request of the trial judge and participated in the prosecution of this case. It was certainly not inappropriate for the judge to make this explanation to the jury after the appellants themselves had generated such a needless issue over the matter.
What we have written disposes of the major contentions for reversal advanced by the appellants. We have grouped numerous assignments of error in our discussion of the several points covered in detail. In addition appellants have suggested other alleged errors based on rulings of the trial judge in regard to particular testimony, rulings of the trial judge with reference to various pre-trial motions, and the giving and refusing of numerous instructions.
*542 We think it would unduly burden this already lengthy opinion if we were to comment on each of these alleged errors. Many of them are illustrated by those which we have heretofore disposed of in detail and the same rules of law would apply. We have considered the others which do not fall within this category and find that they do not constitute reversible error, the same being either without merit or having no harmful effect on the rights of the appellants.
In the interest of clarity and accuracy in any subsequent application of this opinion we summarize herewith our several holdings as follows:
(a) The alleged false testimony of Busbee and Arnold given before the grand jury was material to the matter under investigation. The trial judge ruled correctly on this point.
(b) Busbee and Arnold testified before the grand jury pursuant to a lawful oath with reference to a matter properly under investigation by that body. The trial judge ruled correctly on this point.
(c) Reversible error was committed in permitting the witness Tillett to testify with reference to his conferences and conversations out of the hearing of any of the appellants. Many of these conversations were pure hearsay and the others mentioned in the opinion were totally immaterial to the issues involved in the trial.
(d) Reversible error was committed in allowing into evidence the grand jury indictment against appellant King charging him with violations of the election laws.
(e) Reversible error was committed by allowing into evidence the testimony of witnesses Smith and Tomasello with regard to cash loans to appellant King and the sources of the money.
(f) Reversible error was committed in denying to appellants a transcript of the grand jury testimony given by appellants Gordon, Busbee and Arnold. Otherwise the ruling of the trial judge on the appellants' motion for a transcript of the grand jury testimony was correct.
(g) Reversible error was committed in denying to appellants Gordon and Arnold the right to the opening and closing jury arguments and allowing the State to open and close as against these two.
(h) Reversible error was committed when in his closing argument the prosecuting officer commented upon the failure of appellants Busbee and Arnold to testify in their own behalf.
(i) No error was committed when the trial judge explained to the jury the reason for participation in the trial by State Attorney Hopkins.
(j) Other errors assigned have been carefully examined and we find that they fall within the categories of those which we have discussed in detail herein or else they are either harmless or no error at all.
It is with some degree of apology that we have found it necessary to extend the length of this opinion. Necessity therefor, we think, is justified by the intricacies of the case, the numerous comprehensive briefs that have been filed, plus the consideration of a trial that lasted for three weeks and produced a record in excess of two thousand three hundred pages. While it may seem regrettable that a case so extensive and so expensive will have to be re-tried, it should be obvious that under our democratic system of administering justice we cannot measure the rights of men accused and convicted of serious crimes by this standard. Who would want it otherwise?
For the errors which we have pointed out it is, therefore, necessary that the judgments under assault be and the same are hereby reversed and the cause is remanded for a new trial.
It is so ordered.
TERRELL, C.J., and THOMAS, HOBSON and O'CONNELL, JJ., concur.